## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

Sophia Boyages,

                Plaintiff,

      v.

The University of Vermont and State
Agricultural College,

                Defendant.

Civil Action No. 2:24-CV-538

## DEFENDANT THE UNIVERSITY OF VERMONT AND STATE AGRICULTURAL COLLEGE'S MOTION FOR SUMMARY JUDGMENT

Defendant The University of Vermont and State Agricultural College, by and through counsel, moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment. In support of its motion, Defendant submits the following Memorandum of Law and an accompanying Statement of Undisputed Material Facts.

## Introduction

Though the catamount (or eastern cougar) has not been officially seen in Vermont since 1881, its presence looms large in the state. The catamount has been the official mascot and core identity of UVM Athletics for almost a century. Over the years, the mascot has been embodied in a variety of forms, including the iconic image of a catamount leaping through a stylized letter V (referred to within UVM Athletics as the "V-Cat") and, more recently, a version depicting the catamount head on its own from a ¾ angle.

1

In this suit, Plaintiff—a former program support staff member in UVM's Athletics Department—now seeks to force UVM to pay for the privilege of using a version of its own catamount logo. In January 2023, Plaintiff attended a work meeting at which members of the Athletics Department expressed interest in creating a forward-facing version of the UVM catamount logo to add to its array of catamount marks. Plaintiff promptly executed on the idea and came back with the image depicted at far right below, presenting it to the UVM Athletics Department in the hope that it would be adopted and used as a secondary logo:



**UVM's Catamount Logos**                    **Plaintiff's Version of the UVM Catamount**

In late 2023, Plaintiff registered a copyright in her version of UVM's logo—without any authorization from UVM—and, after leaving her job, demanded that UVM pay her licensing fees.

This gambit reflects an impressive quantity of chutzpah, but it fails as a matter of law. For several reasons, Plaintiff does not and cannot have an enforceable copyright in her version of the University's own intellectual property. First and foremost, Plaintiff's work is derivative of UVM's copyrighted logo: it pervasively uses the characteristic features of UVM's catamount, including its distinctive eyes, muzzle shape, and whiskers, as well as UVM's brand colors.

Moreover, if Plaintiff made contributions to the front-facing catamount that are sufficiently original to deserve copyright protection, they are nevertheless owned by UVM because such contributions were made in the course of her employment.  UVM is entitled to summary judgment on these and the other bases detailed below.

**Factual Background**

### A. UVM's Catamount Mascot and Logo

The UVM catamount dates back to 1926, when the UVM Cynic conducted a poll soliciting the student body's input on adoption of a school mascot.[1]  Choosing between a camel, catamount, cow, or tomcat, the school's students narrowly voted for the catamount by a 138-126 vote.[2]  There have been various embodiments of the school's mascot over the years, including both male and female personifications ("Charlie Catamount" and "Kitty Catamount"), and, for a brief time, a live mountain lion named "Rink."[3]

The current iteration of the school's catamount logo was developed and copyrighted by UVM in 1996.  SUMF, ¶ 7.  The original image was the "V-Cat," which depicted the catamount leaping through the UVM "V" from right to left at a ¾ angle.  *Id.* ¶ 8.  Various versions of this logo have been deployed, including sport-specific logos in which the catamount appeared holding appropriate equipment (e.g., ski poles for the ski team logo).  *Id.* ¶ 9.  In more recent years, the Athletics

---

[1] *See* April McCullum, *The Strange Tale of How UVM Became the Catamounts*, Vt. Pub. (April 17, 2024).

[2] *Id.*

[3] *See* Andy Wittry, *How Vermont Got the Nickname Catamounts*, NCAA (July 10, 2022).

Department has also adopted a head-only version of the logo as a secondary logo, in both full-color and black-and-white versions. *Id*. ¶ 10. Both logos are depicted below:



Exhs. E, F.

### B. Plaintiff's Employment by UVM

Plaintiff Sophia Boyages graduated from college in May 2022 with a bachelor's degree in studio art and a concentration in graphic design. *Id*. ¶ 11. Shortly after graduation, Plaintiff applied for a support position in UVM's Athletic Department. *Id*. ¶¶ 11-12. Plaintiff submitted a resume highlighting her graphic design skills and, during interviews with the Department's leadership, emphasized her passion for graphic design. *Id*. ¶ 12-13.

The Athletics Department offered Plaintiff a position as an Office/Program Support Generalist, which she accepted on October 15, 2022. *Id*. ¶ 14. Upon employment, Plaintiff became subject to UVM's Intellectual Property Policy, which sets forth the framework governing ownership and development of intellectual property at UVM—and, pertinent here, generally provides that UVM owns

intellectual property that is generated within the scope of an employee's work or that makes significant use of UVM materials or resources. *Id.* ¶¶ 14-21. Plaintiff has testified that she understood that she was subject to UVM's policies[4] and would have been aware of the IP Policy following her initial HR meeting on October 24, 2022. *Id.* ¶¶ 16-17.

Plaintiff's position as Office/Program Support Generalist was a broad role. Though the written description for the position enumerated some specific administrative duties, Plaintiff regularly performed tasks outside of those enumerated duties—and, indeed, she understood the Department's Director, Jeff Schulman, considered it part of her job to take on additional tasks when asked to meet the Department's needs. *Id.* ¶¶ 22-23.

From the beginning (and in alignment with the resume Plaintiff submitted and the interests she emphasized during her job interviews), these additional tasks included graphic design work. *Id.* ¶¶ 12-13, 25. Within a few weeks of starting at UVM, Plaintiff created, at the Department's request, a "FanBus graphic" (pictured below to the right), an invitation for the holiday party (pictured below to the left), and a "video board" graphic for a Department event (not pictured), all of which featured the V-Cat logo:

---

[4] Plaintiff signed an offer letter specifying that her position was "subject to the terms and conditions" of the "UVM Staff United bargaining agreement," which in turn provided that all members had an obligation to comply with University policies. *Id.* ¶¶ 14-15.



*Id.* ¶ 26; Exhs. M and O.  During her time at UVM, Plaintiff also designed "host manuals," a "graphic for a hockey team celebration," and a "ticket certificate." SUMF, ¶ 27.  These graphic design projects were created using Plaintiff's personal computer, which she would bring to work.  *Id.* ¶ 28.

## C.    Development of the Front-Facing Version of the Catamount Logo.

In late 2022, Krista Balogh, UVM's Associate Athletic Director for External Relations & Communications, initiated conversations within the Athletics Department about creating a more cohesive brand identity, by among other things, cleaning up the Department's different marks and potentially developing a new secondary mark.  *Id.* ¶¶ 4, 29.  To accomplish this goal, Ms. Balogh convened a task force—the Branding Working Group ("BWG")—that consisted of a diverse array of stakeholders from UVM's Athletics Department, including Plaintiff.  *Id.* ¶¶ 30-31.

At the BWG's first meeting on January 24, 2023, the group discussed, in Plaintiff's words, creating a "modern" "front-facing" version of UVM's catamount logo, as "a large majority of Division 1 athletics programs ha[d] a front-facing logo." *Id.* ¶ 32.  During the meeting, one of the BWG members circulated an email with UVM's existing ¾-angle, head-only version of the V-Cat.  *Id.* ¶ 33.  Another BWG

member, Pete Estes—UVM's Director of Broadcast and Creative Content—shared a different version of that logo, which he had rendered in gold, green, and white (pictured left below). *Id.* ¶¶ 5-6, 34. Directly after the meeting, Mr. Estes also created a green-and-gold version (pictured right), which he shared with Plaintiff:



*Id.* ¶¶ 35, 42 and Exhs. U, T, and W.

Later that day, Plaintiff began working on a front-facing version of UVM's catamount logo; as she has acknowledged, the only reason she commenced work on the front-facing version of the logo was because "it had been brought up" during the BWG meeting. SUMF, ¶¶ 36-37 (quoting Exh. A, Pl.'s Dep. Tr. at 80:22 to 81:22). Her goal was to develop something "strong enough" that UVM might ultimately use as a logo. *Id.* ¶ 38 (quoting Exh. A, Pl.'s Dep. Tr. at 82:2-22, 89-5-8). She later testified that, in creating a new version of the logo, she also sought to showcase her skills and value to UVM in the hope of being promoted. *Id.* ¶ 39. By the evening of January 24, Plaintiff had a working design based on UVM's V-Cat and ¾-angle catamount head, as well as on other images she located online, including a clip-art drawing of a jaguar. *Id.* ¶ 40.

While physically present at work on January 25, Plaintiff shared her draft design with Mr. Estes. *Id.* ¶ 41. During regular business hours the next day,

Plaintiff texted Mr. Estes an updated design in a side-by-side comparison with the
¾-angle catamount head that Mr. Estes had rendered in green and gold:



*Id.* ¶ 42 and Exh. W.  Over the next several days, Plaintiff edited the initial design
based on Mr. Estes' feedback "to make the image look as close to a catamount as
possible."  SUMF, ¶ 44 (quoting Exh. H, Pl.'s Int. Responses, at 5-6).

Plaintiff shared her working design at the BWG's second meeting, which took
place on January 31, 2023, with the hope that the Athletics Department would
adopt it as an official logo.  *Id.* ¶ 45.  In sharing the design, Plaintiff did not make
any demand or request for compensation, nor did she suggest that she expected to
be paid for her contribution to the group's work (beyond the salary she already
received).  *Id.* ¶ 46.  The reaction at the meeting was overwhelmingly positive: the
front-facing version of the logo was "unanimously loved."  *Id.* ¶ 47.  Plaintiff texted
her parents immediately after the meeting that the logo had been approved and was
"going to the university for final approval."  *Id.* ¶ 48.  About two weeks later,
Plaintiff texted her college roommates that she "made a logo" that was "going to be
uvm athletics new logo," which would "show up on espn, the uniforms, and player

gear for this coming fall," and the plan was to "officially announce the logo to the press at some point in the spring." *Id.* ¶ 53.

However, some material alterations were made to the image along the road to its adoption by UVM. Plaintiff's working design was not symmetrical, and, as Peter Estes later testified, it "needed some work" before it could be employed as the Athletics Department's secondary logo. *Id.* ¶ 54. To get the design to the point where it would be fit for use, Mr. Estes divided the logo in half and mirrored it to ensure it was symmetrical. *Id.* ¶ 55. Mr. Estes also cleaned up the image so the lines were smoother, especially around the top of the head and jawline. *Id.* ¶ 56. Mr. Estes spent approximately 12-14 hours editing the design. *Id.* ¶ 57.

In April 2023, UVM's Athletic Director introduced the front-facing catamount logo (as modified by Mr. Estes) to UVM's President and Administration, describing it as "just a different angle on our traditional Catamount." *Id.* ¶ 60. UVM unveiled the front-facing catamount to the public in a social media post shortly thereafter, and rolled it out over the next several months, displaying it on walls, putting it on uniforms, and creating an apparel line. *Id.* ¶ 61. In June, UVM applied for trademark protection. *Id.* ¶ 62.

Almost six months later, Plaintiff herself filed a copyright application for the front-facing version of the catamount head logo, without notifying UVM or seeking its permission. *Id.* ¶¶ 64-65. Plaintiff's application described the image as the "SophCat," identifying herself as the sole author and claiming it was first published on January 31, 2023. *Id.* ¶ 64. The image submitted with the application was not

her own version, but rather the revised, symmetrical version subsequently prepared by her coworker Peter Estes. *Id.* ¶ 65. Neither UVM nor Mr. Estes received mention in the copyright application. *Id.* ¶¶ 64-66.

On December 4, 2023, Plaintiff resigned from the Athletics Department. *Id.* ¶ 63. Two weeks later—and more than 300 days after presenting the front-facing logo to the BWG—Plaintiff formally notified UVM of the pending copyright application and accused UVM of "alleged infringement of the SophCat Design." *Id.* ¶¶ 45, 69. This suit followed.

## Legal Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(e). As "the burden is on the moving party to demonstrate the absence of a genuine issue of material fact," all ambiguities and inferences must be resolved "in favor of the nonmoving party." *Schroeder v. Makita Corp.*, No. 2:02-CV-299, 2006 WL 335680, at *5 (D. Vt. Feb. 13, 2006). To create a genuine dispute of material fact, the nonmoving party must "set forth specific facts," not mere "allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e).

## Argument

Plaintiff's claim in this lawsuit is straightforward: she alleges that UVM is unlawfully reproducing and distributing an image that, she contends, is her own original, copyrighted work. To prevail on her claim, Plaintiff must show "(i)

10

ownership of a valid copyright; and (ii) unauthorized copying." *Renzello v. Nelson*, No. 1:05-CV-153, 2006 WL 8431563, at *9 (D. Vt. July 11, 2006). She cannot demonstrate either, for several reasons. First, Plaintiff prepared the image at issue in the course of her work for the Athletics Department, to accomplish an identified goal of the BWG: developing a front-facing version of UVM's existing catamount logo. Under both the Copyright Act and UVM's Intellectual Property Policy, UVM—and not Plaintiff—owns any copyright in that work product. Second, Plaintiff's image is directly derivative of UVM's copyrighted catamount logo, and UVM has the sole right to authorize and prepare derivative works. If Plaintiff did *not* create the image in the course of her work, then her preparation of the derivative image was unauthorized and she can claim no valid copyright in it. Third, even if Plaintiff owned a valid, enforceable copyright, she is equitably estopped from claiming infringement from the copying and use of her work based on her course of conduct.

## I.    UVM Owns Any Copyright in the Front-Facing Catamount.

Plaintiff's claim fails in the first instance because any copyright in the front-facing catamount belongs to UVM. The logo was developed directly in the course of Plaintiff's work for the Athletics Department: Plaintiff created the image for the express purpose of fulfilling an objective identified and discussed at an Athletics Department meeting, attended during working hours as part of her job, and she developed it with the intention of her employer adopting and using her work product. Under these circumstances, UVM owns the rights pursuant to both the Copyright Act's work-for-hire doctrine and UVM's Intellectual Property Policy.

### A. As a Work Made for Hire, the Front-Facing Catamount Belongs to UVM under the Copyright Act.

Under the Copyright Act of 1976, a copyright generally "vests . . . in the author or authors of the work." 17 U.S.C. § 201(a). Works made for hire represent the most significant exception to this principle. Where a work is prepared for an employer, "the employer or other person for whom the work was prepared is considered the author . . . , and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). Put another way, the Copyright Act vests copyright ownership in an employer where the work at issue was "prepared by an employee within the scope of his or her employment." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (quoting 17 U.S.C. § 101).

Thus, UVM owns the copyright in the front-facing version of its catamount logo to the extent Plaintiff's contributions were performed within the scope of her employment by the Athletics Department. In making this determination, courts look to whether the work was (1) of the kind "that the plaintiff was employed to perform"; (2) performed "substantially within the authorized time and space limits of the job"; and (3) "actuated, at least in part by a purpose to serve the employer." *See Fluerimond v. New York Univ.*, 876 F. Supp. 2d 190, 199-200 (E.D.N.Y. 2012). The undisputed facts answer all three of these questions with an unequivocal yes.

To start with, there can be no question that Plaintiff's work on the front-facing catamount was actuated in large part by a purpose of serving UVM's needs. Plaintiff testified at deposition that she designed the logo to meet the BWG's

identified desire for a front-facing version of UVM's logo and presented it to the

BWG in the hope that UVM would use it:

> Q.    The reason that you started about creating that front-facing version of the catamount logo head was that it had been brought up in the Branding Working Group meeting you attended, correct?
>
> A.    Yes.
>
> Q.    Prior to that discussion of . . . the possible creation of a front-facing version of the catamount logo head, you hadn't done any sketches of an alternate logo for UVM, had you?
>
> A.    No.
>
> Q.    Had you drawn any catamount heads prior to that point?
>
> A.    No.
>
> Q.    And you didn't have any plans to develop a catamount head logo prior to that meeting, correct?
>
> A.    No.
>
> . . .
>
> Q.    When you set about creating this front-facing version of the catamount logo head, was it your hope to develop something that UVM might ultimately use as its logo?
>
> A.    If I felt it was strong enough to show.
>
> Q.    But your goal was to develop an image that you could then bring back to the Branding Working Group and present as an option, correct?
>
>         MS. BETTS:  Objection.
>
> Q.    If you felt that it was strong enough.
>
> A.    Yes.

SUMF, ¶¶ 36-39, 45 and Exh. A, at 81:5 to 82:12; *see also* Exh. R at 19:19-22 ("Q.

[Y]ou presented the logo to the group in the hope that UVM would adopt and use it,

correct? A. Yes.").  These statements, on their own, carry "significant weight" in

demonstrating that the front-facing catamount was a work for hire. *Fluerimond*, 876 F. Supp. 2d at 209 (explaining that plaintiff's concession that she "delivered the design to NYU with the hope and intention that NYU would use it" "weighs heavily in favor of finding that . . . [p]laintiff's motivation was to serve NYU").

Second, Plaintiff's work on development of a secondary logo fell within the kind of work that she was employed to provide. Courts generally apply a holistic test to determine the work a person is employed to provide, considering "the degree of control an employer had over the employee's project," "whether the employee relied solely on knowledge gained within the scope of the pertinent employment to create the work in question," and whether the work was "incidental," i.e., "subordinate" or "pertinent," to work "the employee was authorized to perform." *See Sterpetti v. E-Brands Acquisition, LLC*, 6:04-CV-1843, 2006 WL 1046949, at *5 (M.D. Fla. Apr. 20, 2006) (quoting Restatement (Second) of Agency, § 229 (1958)) (collecting cases). Work is "incidental" to work the employee was authorized to perform as long as it is "within the ultimate objective of the" employer and "not unlikely" to be performed by an employee. Restatement (Second) of Agency, § 229, cmt. b.

Here, there can be little question that Plaintiff's work on the front-facing logo was incidental to her authorized work. Plaintiff was tasked to serve as a member of the BWG, which was actively engaged in a rebranding effort and exploration of new secondary logos. Development of an alternative version of the UVM catamount logo was squarely "within the ultimate objective" of her employer. Plaintiff has also

14

admitted that she regularly performed graphic design work at UVM—indeed, her current resume describes her job responsibilities at UVM as having included the creation of "original social media graphics, video board images, certificates, invitations, and banners for UVM Athletic events."  SUMF, ¶¶ 23-28 and Exh. G.  It was thus "not unlikely" that Plaintiff would contribute to work on an alternate logo design.  Restatement (Second) Agency, § 229, cmt. b; *see also id.* (an important factor in determining if work is "incidental" is "whether or not the act is one commonly done").  Plaintiff also designed the front-facing catamount based exclusively on knowledge she gained while working for UVM: as noted above, she acknowledged at deposition that she had no plans to create a front-facing catamount logo until she attended the BWG meeting, and began developing one only because "it had been brought up" during that meeting.  SUMF, ¶¶ 36-37.

While Plaintiff's written job description did not explicitly include graphic design work, a job description is just one factor courts will consider in determining the nature and scope of an employee's job responsibilities.  *See Le v. City of Wilmington*, 480 F. App'x 678, 684, n.5 (3d Cir. 2012) (rejecting employee's argument that work was "not within the scope of his employment" because it was not listed in "his job description").  Plaintiff was employed as a generalist and has acknowledged the expectation that she would contribute where needed—and she herself emphasized her graphic design experience in applying for the job, so it was reasonable to expect that her skills and experience would be called upon.  SUMF, ¶¶ 12-13, 22-23.  As Plaintiff admitted at deposition that she regularly performed

tasks outside her written job description, including graphic design work, the text of the written description is not determinative of the work-for-hire analysis. *See Sterpetti,* 2006 WL 1046949, at *5 (holding that though employee "was not hired specifically" to create a restaurant manual, his job requirements "changed during the course of his employment").

Third, Plaintiff's contributions to the front-facing catamount logo occurred substantially within the authorized time and space limits of her job. The impetus for the work arose from the BWG meeting she attended during working hours, and Plaintiff performed some of the work on the logo while physically present at UVM and during normal business hours. SUMF, ¶¶ 32-37, 41-42.

Plaintiff may allege that she created the logo in her "own time," Am. Compl. ¶ 17 (Aug. 8, 2024), but, even if that were so, it would not be dispositive here. The work-for-hire "doctrine is not avoidable merely by performing the work in a separate location, or on non-work time." *In re Simplified Info. Sys.*, 89 B.R. 538, 542 (W.D. Pa. 1998). What matters is that Plaintiff designed the logo during the period in which she was serving as a BWG member and specifically presented it at work as a potential idea for a secondary logo. SUMF, ¶¶ 31, 38-39, 45; *Genzmer v. Pub. Health Tr. of Miami-Dade Cty.*, 219 F. Supp. 2d 1275, 1282 (S.D. Fla. 2000) (explaining that it did not matter if employee "wrote the software at issue in his home, using his home computer, during off-duty hours" because "[he] performed the work during the time period in which he was employed . . . to complete [his] research program") (collecting cases)); *see also U.S. Auto Parts Network, Inc. v.*

16

*Parts Geek, LLC*, 692 F.3d 1009, 1018 (9th Cir. 2012) (explaining that "when there is evidence that the employee's creation was the kind of work the employee was employed to perform, courts have tended to put little weight on evidence that the work was done at home on off-hours" (quotation omitted)); 18 C.J.S. Copyrights § 23 (if "an employment relationship exists, the mere fact that preparations were done outside of an employee's office or normal working hours does not necessarily remove them from the scope of employment." (alteration omitted)).

Ultimately, the analysis boils down to a simple proposition: Plaintiff has acknowledged that, but for her employment with and participation in the BWG, she would not have been aware of the Athletics Department's desire for a front-facing logo and would not have created the design at issue. The design thus unmistakably arose from her employment and was actuated by a desire to serve her employer. As such, it was a work for hire and is owned by UVM. *See McKenna v. Lee,* 318 F. Supp. 2d 296, 301 (E.D.N.C. 2002) (finding license plate design was a work for hire and "created primarily for the benefit of the employer" where, notwithstanding fact that it was developed in plaintiff's own time and space, it was "clear that but for the employer's specific need for a new license tag design, the . . . design would not have been created" by plaintiff), *aff'd*, 53 F. App'x 268 (4th Cir. 2002).

### B. UVM's Intellectual Property Policy Assigns Ownership to UVM.

Even absent the work-for-hire doctrine, UVM would nonetheless own any copyright in the front-facing catamount pursuant to its Intellectual Property ("IP") Policy.

UVM has had an IP Policy for many decades; the current version was

adopted May 9, 2013 and was in effect at all times relevant here.  SUMF, ¶¶ 14-18.

The IP Policy provides "the framework that governs the ownership, disposition, use

and commercial development of University inventions, discoveries and creative

endeavors."  *Id*. ¶ 19.  This framework "govern[s] the activities of University faculty

and staff," including any individual "employed by the University to carry out

administrative, academic or technical duties of any nature or kind"—and, indeed,

Plaintiff admitted at deposition that she knew that she was required to comply with

UVM's IP Policy.  *Id*. ¶¶ 16-17, 20.

Relevant here, Sections 2.3.2 and 2.3.3 of the IP Policy provide for UVM

ownership of works developed using UVM resources or in the course of employment:

### 2.3.2. Developed with Significant Support of University Financial Assistance or through Use of University-Supported Resources

. . . Intellectual Property developed . . . through the use of significant
financial support from the University, including but not limited to use of
University-supported facilities and resources as well as time devoted to
University functions of research and other University activities are hereby
assigned to the University and considered "University-Owned." . . . Only
when the use of University facilities, materials or other resources makes a
material contribution to the Intellectual Property, will it be considered
"significant" use.

### 2.3.3. Developed within the Scope of Employment

. . . Intellectual Property developed by University faculty and staff within the
scope of their employment is owned by the University to the extent permitted
by law. Where University ownership is not automatically established by
operation of law, such Intellectual Property is nevertheless by operation of
this Policy assigned to the University as "University-Owned".

*Id*. ¶ 21 and Exh. K.  Federal courts have regularly considered similar university

intellectual property policies and concluded that they constitute an enforceable part

18

of an employee's contract.  *See, e.g.*, *Fenn v. Yale Univ.*, 283 F. Supp. 2d 615, 628-29 (D. Conn. 2003) ("University patent policies such as Yale's have long been recognized as a valid and enforceable part of the contract of employment."); *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1356-57 (Fed. Cir. 2001) (holding that employee had duty to assign inventions because, even though it was "true that [employee] never signed a contract with the University specifically obligating her to assign her inventions to the University, she accepted her academic appointment subject to the administrative policies of the University").

Applying the IP Policy, UVM owns any copyright that might exist in the front-facing catamount for two independent reasons.  First, as detailed above, the logo was created in the scope of Plaintiff's employment; even if the Copyright Act's work-for-hire doctrine did not "automatically establish[]" UVM's ownership "by operation of law," § 2.3.3 of the IP Policy operates to assign ownership to UVM. Second, the logo was developed with the "material contribution" of a critical UVM resource: its existing copyrighted logo.  As discussed below, Plaintiff's design is unmistakably derivative of UVM's logo, and was developed to embody and execute on an idea (the creation of a front-facing rendering of the logo) that was proposed by other employees in the Athletics Department.  Moreover, final execution of the idea was completed by another UVM employee. There can be no serious question that the use and integration of defining aspects of the existing copyrighted logo to create a derivative version constitutes use of the University's resources under § 2.3.2 of the Policy.  Accordingly, UVM is entitled to summary judgment in its favor.

II.    **Plaintiff Does Not Have a Valid Copyright in the Front-Facing Catamount Logo Because It Is an Unauthorized Derivative Work.**

If UVM does not own the copyright to the front-facing version of its logo under the work-for-hire doctrine or its IP Policy, Plaintiff's copyright claim nonetheless fails because her image is unmistakably derivative of UVM's preexisting catamount logo. Only UVM has authority to prepare derivative works. If Plaintiff did not have UVM's permission to create a derivative work—and the only authority she would have had to work with and create derivative versions of UVM's intellectual property would have been for use in the scope of her employment—her version of UVM's logo was unauthorized and her copyright is not enforceable. Thus, if the Court does not conclude that UVM owns the copyright in the front-facing version of its logo, the Court should grant summary judgment to UVM on the alternative ground that Plaintiff lacks an enforceable copyright in her derivative version of UVM's intellectual property.

### A. *Plaintiff's Design Is Substantially Similar to and Therefore Derivative of UVM's Copyrighted Catamount Logo.*

The Copyright Act grants a copyright holder the "exclusive right" to prepare and authorize "derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). A "derivative" work is one "based upon one or more preexisting works" that "recast[s], transform[s], or adapt[s]" the original work. *Id*. § 101. A work will be deemed "derivative" of a pre-existing work where it "bears 'substantial similarity' to protected expression in the earlier work." *Williams v. Broadus*, No. 99 CIV. 10957 MBM, 2001 WL 984714, at *3 (S.D.N.Y. Aug. 27, 2001) (quoting *Castle Rock Entm't, Inc. v. Carol Pub'g Grp, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).

The determination of "substantial similarity" typically relies on the "ordinary observer" test, which instructs that "[t]wo works are substantially similar where the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal [of the two works] as the same." *Castle Rock Entm't*, 150 F.3d at 139 (citations and quotation marks omitted, alterations in original) (affirming summary judgment on determination of substantial similarity). The ordinary observer test is guided by "good eyes and common sense." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (quotation omitted)).

There can be no question that the front-facing catamount is directly derivative of UVM's existing logo, based both on the circumstances of its creation and the particulars of the image. Upon learning of the BWG's interest in creating a modern front-facing version of UVM's catamount logo, Plaintiff immediately began executing the idea, taking the characteristic features of UVM's copyrighted catamount logo and presenting them from a slightly rotated perspective. SUMF, ¶¶ 36-37, 70-77. She was successful in that endeavor, for the visual continuity between the front-facing catamount and UVM's existing three-quarter logo is immediately apparent to the casual observer:



Exh. U                    Exh. FF

Both logos present a feline head in the same precise pose, with an open mouth and ears laid back. *Id.* ¶ 70. As highlighted below, the eyes—which give an animal logo its uniqueness and personality—are identical in both logos, as are the geometric shape used to depict the side of the muzzle and the logo's sharp, stylized triangular whiskers:[5]



*See* Exh. KK, at 10, 12; SUMF, ¶¶ 73-75.  The images also share the same indentation in the middle of the forehead, as well as a triangular dark patch above the muzzle, and Plaintiff's design employs UVM's traditional green-and-gold color

---

[5] The final version of the front-facing catamount has four whiskers, whereas the existing catamount logo has five; notably, though, Plaintiff's earlier working version (depicted on page 8) included five whiskers.  SUMF, ¶¶ 42-43, 75.  Regardless of number of whiskers, the style of the whisker is the same. *Id.* ¶ 75.

scheme.  *Id.* ¶¶ 71, 74, 76.[6]

Even a passing visual comparison confirms that Plaintiff's version of the
catamount logo is substantially similar to UVM's copyrighted logo.  And, indeed,
UVM understood the front-facing catamount to be simply a new take on its
longstanding catamount logo.  UVM's Athletic Director unveiled the front-facing
logo to UVM's Administration as "just a different angle on [the] traditional
Catamount" because "[t]he only new element is the straight on view."  *Id.* ¶ 60.
Similarly, upon first seeing the front-facing logo, UVM's Vice Provost responded
that he loved "the Catamount head on."  *Id.* ¶ 59.

Plaintiff will likely suggest the two logos are not substantially similar
because of differences in the teeth, the shape of the ears, and the shape of the
jawline.  But the ordinary observer test is guided by "total concept" and "feel," not
"minor" design differences.  *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d
502, 510-11 (7th Cir. 1994); *see also Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*,
558 F.2d 1090, 1093 (2d Cir. 1977) ("[B]y definition, the copying need not be of every
detail so long as the copy is substantially similar to the copyrighted work."
(quotation and alteration omitted)); *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81
F.2d 49, 56 (2d Cir. 1936) ("[I]t is enough that substantial parts were lifted; no
plagiarist can excuse the wrong by showing how much of his work he did not

---

[6] While "[c]olor by itself is not subject to copyright protection," courts will take color into account
when determining substantial similarity.  *Boisson v. Banian, Ltd,* 273 F.3d 262, 271, 274 (2d Cir.
2001) (citing "overwhelming similarities in color choices" in finding works substantially similar).
Moreover, as Plaintiff's expert testified, color consistency is a "significant aspect of any collegiate
brand," such that it accounts for "50% of brand recognition."  *Id.* ¶ 71.  Plaintiff's use of UVM's brand
colors reflects her intent to create a version of UVM's logo that fit recognizably within the existing
brand.

pirate.").

Considering "the overall artistic expression of the entire animal faces," any differences between the two logos are insignificant, especially because those differences are primarily the result of the shift in perspective from a three-quarter to a forward-facing view. *Carol Wright Sales, Inc.,* 18 F.3d at 510-11 (holding that duffel bags with "plush" animal heads were substantially similar as the animals were "very similar in size, shape, pose, and feel," even though there were some "variations" in the animals' eyes, noses, trunks); Exh. KK, at 8, 11 (discussing visual elements of Plaintiff's design that resulted from shift in perspective). *See also Dollcraft Indus., Ltd. v. Well-Made Toy Mfg. Co.*, 479 F. Supp. 1105, 1110, 1117 (E.D.N.Y. 1978) (holding that stuffed lamb toys were substantially similar as they had the same "basic color" "face, posture, mouth, nose" and ears, and any differences were "minor"); R. *Dakin & Co. v. A&L Novelty Co., Inc.*, 444 F. Supp. 1080, 1082, 1084 (E.D.N.Y. 1978) (holding stuffed toy hippos were substantially similar as the "shape of the head and body," and "the placement of the eyes, ears, nose, and mouth, and the color scheme" were "practically identical," although the ears in one were "slightly larger").[7]  As the front-facing catamount logo is substantially similar to UVM's existing catamount logo, it is a derivative work.

---

[7] *See also Ty, Inc. v. GMA Accessories, Inc.*, 959 F. Supp. 936, 942-43 (N.D. Ill. 1997) (holding that two "bean bag" pigs were substantially similar in part because the "shape of the stuffed heads," "placement of the eyes," and nose were "identical," and any "noticeable differences" were "[s]uperficial") (quotation omitted)); *Celebration Intern., Inc. v. Chosum Intern.*, Inc., 234 F. Supp. 2d 905, 918 (S.D. Ind. ) (holding that two tiger Halloween costumes were substantially similar notwithstanding differences in color, shape of the nose, and shape of the mane because "[a] quick glance from an ordinary observer reveals that the tiger faces are very similar; the size, shape, and feel of the heads are nearly identical").

**B. Plaintiff Does Not and Cannot Have a Copyright Enforceable Against UVM in an Unauthorized Derivative Work.**

Under the circumstances here, the conclusion that Plaintiff's work is derivative of UVM's copyright logo necessarily means that Plaintiff cannot have a valid copyright enforceable against UVM. Any authority Plaintiff had to develop an alternative, derivative version of UVM's logo arose from her employment by UVM and work on its behalf; UVM did not ever authorize Plaintiff to make use of its intellectual property for her own purposes and profit. SUMF, ¶¶ 81-83 & Declaration of Krista Corran, ¶¶ 9-10 (July 8, 2025). Thus, to the extent Plaintiff developed the logo for her own gain outside the scope of her employment, her use of UVM's intellectual property was unauthorized—and, as discussed below, that precludes any enforceable copyright given the pervasive use of UVM's copyrighted material in her derivative version. Further, even if Plaintiff had rights in her derivative version of the logo, those rights could not be asserted against UVM, as the owner of the primary copyright and holder of the exclusive right to authorize derivative works.

Copyright protection generally extends only to "original works of authorship," 17 U.S.C. § 102(a), which means that "the work was independently created by the author, rather than copied from other works, and that it possesses a modicum of creativity," *Earth Flag Ltd. v. Alamo Flag Co.*, 153 F. Supp. 2d 349, 353 (S.D.N.Y. 2001). While derivative works also may garner copyright protection, "the protection of derivative works is limited" in scope. *Wozniak v. Warner Bros.*, *Entertainment, Inc.*, 726 F. Supp. 3d 213, 237 (S.D.N.Y. 2024). Protection of derivative works

"extends only to the non-trivial, original contributions of the derivative work's author," and not to the "pre-existing material used without permission." *Id.* (quotation omitted). And, critically, "if the pre-existing material used without permission 'tends to pervade the entire derivative work,' copyright protection is denied to the derivative work entirely." *Dynamic Sols., Inc. v. Plan. & Control, Inc.*, 646 F. Supp. 1329, 1340 (S.D.N.Y. 1986) (quoting Nimmer on Copyright, § 306, at 3–22.2 (1985)); *see also Anderson v. Stallone*, No. 87-0592 WDKGX, 1989 WL 206431, at *10 (C.D. Cal. Apr. 25, 1989) ("The case law interpreting [17 U.S.C. §] 103(a) . . . supports the conclusion that generally no part of an infringing derivative work should be granted copyright protection").

*Wozniak* is instructive. In that case, plaintiff, a freelance writer for DC Comics, wrote a story containing "numerous and repeated references to characters" from DC Comics' Batman Universe "with the goal of publishing" the story at DC Comics. 726 F. Supp. 3d at 223. The writer eventually filed a copyright action alleging that Warner Brothers was infringing on his story. The court disagreed, holding that the writer did not have a valid copyright as "pre-existing copyrighted material . . . pervade[d] the entire story"—the story's "entire premise and plot centers on Batman," and by plaintiff's "own account, the [s]tory represents his 'reimagining of the Batman universe.'" *Id.* at 238 (quotation and alterations omitted).

So too here. Plaintiff's avowed goal was to create a logo that would meet UVM's identified desire for a "modern" take on its longstanding catamount. SUMF,

¶¶ 32, 36-39, 45.  As such, the distinguishing features of UVM's existing catamount—eyes, muzzle shape, whiskers, colors—pervade the front-facing catamount logo.  *Id.* ¶¶ 71-75.  When the front-facing logo is stripped of those distinguishing features, along with the changes that inevitably flow from the shift in perspective (the ears and jawline), all that is left that is arguably distinct is the shape of the head and rendering of the teeth.  *Id.* ¶¶ 78-80.  Those remaining features are not even sufficiently original to merit copyright protection, as they were copied from a clip art drawing of a jaguar Plaintiff has admitted using as a reference in designing the image:



*Id.* ¶ 80 and Exh. KK; *Shine v. Childs*, 382 F. Supp. 2d 602, 610 (S.D.N.Y. 2005) (explaining that the essence of originality is that "the work was independently created by its author, and not copied from someone else's work" (quotation omitted)).  In any event, any arguably distinct features in the front-facing logo do not change the fact that the characteristic features of UVM's copyrighted work pervade the logo.  As such, Plaintiff cannot have a valid copyright in the front-facing catamount.  *See Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F. 2d 27,

30-32, 34, n.6 (2d Cir. 1982) (noting that if licensee did not have copyright holder's "consent to produce a derivative work . . . its derivative copyrights would be invalid, since the pre-existing illustrations used without permission would tend to pervade the entire derivative work" (quotation and alterations omitted).[8]

Additionally, even if Plaintiff had limited rights in her version of UVM's logo, those rights could not be enforced against UVM—indeed, it would be anomalous to hold that UVM has the exclusive right to prepare derivative works of its logo, *see* 17 U.S.C. § 106(2), but can be sued for infringement of a derivative version of its own logo. This very issue arose in *Stallone*, a case involving a copyright claim against actor Sylvester Stallone and others for alleged infringement of a story developed by the plaintiff based on the Rocky movies (the scripts for which were written principally by the actor). *See Stallone*, 1989 WL 206431, at *1-2. The court concluded that the plaintiff's story was derivative of the copyrighted Rocky movies, and, because elements of those movies pervaded the story, lacked any copyright protection. *Id.* at *11. However, the court alternatively held that, "[e]ven if this Court were to interpret section 103(a) as allowing an author of an infringing derivative work to sue third parties based on the non-infringing portions of his work, section 106(2) most certainly precludes the author of an unauthorized infringing derivative work from suing the author of the work which he has already

---

[8] *See also, e.g.*, *Pickett v. Prince*, 52 F. Supp. 2d 893, 907-08 (N.D. Ill. 1999) (noting that under the "Second Circuit's 'pervades' approach," plaintiff did not have a valid copyright in a guitar shaped like the Prince symbol as "all aspects of the Symbol appear to be incorporated by the guitar"); *Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1240-41 (C.D. Cal. Feb. 11, 2003) (holding that plaintiff did not have a valid copyright in "spoof" commercials "styled along the lines of . . . preexisting commercials for Jack-in-the-Box restaurants" as copyrighted footage was "integrated into and integral" to the commercials, and noting that if the "proprietary . . . elements are ignored," the "residuum seems insufficient" to be copyrighted).

infringed." *Id.* (observing that "[s]ection 103(a) was not intended to arm an infringer and limit the applicability of section 106(2) [to] derivative works").

### C. *Plaintiff's Copyright Is Unenforceable Because She Failed to Disclose Preexisting Works in Her Application.*

The derivative nature of Plaintiff's design has another consequence here that is independently dispositive of Plaintiff's claim. Because Plaintiff's design was based on UVM"s copyrighted logo, Plaintiff was required to disclose UVM's logo as a preexisting work when filing an application to register her copyright—and her knowing failure to do so renders her copyright unenforceable.

The Copyright Act requires an applicant for copyright registration in a derivative work to include "an identification of any preexisting work or works that it is based on or incorporates." 17 U.S.C. § 409(9). This requirement allows the Copyright Office to determine "if the author of the derivative work has made an original contribution" that is copyrightable. *Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prods., Inc.*, No. 1:19-CV-3766-GHW, 2020 WL 3000343, at *7 (S.D.N.Y. June 4, 2020). "A knowing failure to provide such information, like other misstatements on a copyright application, is grounds for rendering the copyright registration unenforceable." *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 23 (S.D.N.Y. 2001).

*Garner v. Sawgrass Mills Ltd. Partnership*, Civil No. 3-94-307, 1994 WL 829978 (D. Minn. Dec. 22, 1994), is directly on point. In that case, a mall created an alligator head logo to use for promotional purposes. It later commissioned an artist to develop an alligator character based on the original logo. After the mall provided

the artist with copies of the logo and a "description of some of the elements [it] wanted incorporated into the alligator characterization," he created "an alligator character wearing a shirt and carrying a shopping bag." *Id*. at *1. The mall went on to modify the artist's logo and use it in a variety of commercial contexts.

When the artist sued the mall for infringement of his registered copyright in his depiction of the mall's alligator character, the court held that he was barred from pursuing his claim because he "knowingly failed to disclose a preexisting work to the copyright office." *Id*. at *8. Though acknowledging that "issues concerning a party's knowledge are not typically resolved on summary judgment," the Court held that the undisputed evidence established that the artist "knew of the prior work," his logo was "based on and substantially incorporated" it, and he "failed to disclose that to the Copyright Office." *Id*. & nn. 6-7. The Court explained that even if the artist's logo was "a completely new work of art," as he contended, that did not "obviate the requirement that [he] disclose the derivative nature of the work" as the point of disclosure is to allow the Copyright Office to determine "the scope of the protection to be afforded." *Id*. n. 7. Similarly, the artist's knowledge of any "prior copyright" was "irrelevant" because "the copyright application requires applicants to disclose all 'preexisting material,' not just material which is copyrighted." *Id*.

Plaintiff's copyright claim is barred for precisely the same reasons. It is undisputed that Plaintiff's logo was based on and incorporated elements of UVM's preexisting catamount logos. SUMF, ¶¶ 40, 42, 70-77. In her sworn discovery responses, Plaintiff admitted that she "referenced" and used UVM's preexisting

logos as "source materials" while drafting the front-facing catamount logo, as well as a clip-art image of a jaguar. *Id.* ¶ 40 and Exh. A, at 83:1-13 to 84:9, 100:24 to 101:2. There is no dispute, even from Plaintiff's expert, that the front-facing logo copies the eyes, muzzle shape, and whiskers in UVM's preexisting logos. *Id.* ¶¶ 73-75 and Exh. JJ. And Plaintiff's main design contribution—the front-facing perspective—was based on a concept previously identified by the BWG. *Id.* ¶¶ 32, 36-37. Plaintiff did not disclose any of this when she filed her copyright application in December 2023 with the assistance of counsel. *Id.* ¶¶ 64-66. Her copyright application is therefore invalid because, as one court put it, she failed to disclose that "the overall concept behind and numerous elements of [the] registered works are plainly copied from existing works." *See R. Ready Prods, Inc. v. Cantrell,* 85 F. Supp. 2d 672, 692 (S.D. Tex. 2000) (holding that plaintiffs' copyrights were invalid because the "overall concept behind and numerous elements" were "plainly copied from existing works" by other companies, and plaintiff's "employment [with one of the companies] and his access to the prior works . . . leads inescapably to a finding that [plaintiff] knowingly failed to advise the Copyright office of material facts"); *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 983, 988-89 (S.D.N.Y. 1980) (declining to enforce copyright and granting summary judgment because plaintiff consciously decided "not to disclose to the Copyright Office . . . pre-existing works on which his designs [were] based").

    For all of these reasons, Plaintiff lacks any copyright in the derivative version of UVM's logo enforceable against UVM. UVM is entitled to summary judgment on

that basis.

## III.    Plaintiff Is Equitably Estopped from Pursuing Her Copyright Claim.

Lastly, to the extent that Plaintiff had any ownership claim in the design, she would be equitably estopped from asserting it.  In *Dallal v. New York Times Co.*, No. 05-2924, 2006 WL 463386 (2d Cir. Feb. 17, 2006), the Second Circuit confirmed that equitable estoppel "may deprive a plaintiff of an otherwise meritorious copyright infringement claim" if:

> 1) the plaintiff had knowledge of defendant's infringing acts, 2) the plaintiff either intended that defendant rely on his acts or omissions or acted or failed to act in such a manner that defendant had a right to believe that it was intended to rely on plaintiff's conduct, 3) the defendant was ignorant of the true facts, and 4) the defendant relied on plaintiff's conduct to its detriment.

*Id.* at *1; *see also Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) ("In the context of a copyright action the holder's rights may be destroyed if the defendant shows that: the party to be estopped had knowledge of defendant's infringing conduct, and either intended that his own conduct be relied upon or acted so that the party asserting the estoppel has a right to believe it was so intended." (citation omitted)).

The undisputed facts demonstrate that all of these elements are met here. Plaintiff presented the front-facing catamount logo to the BWG hoping UVM would use it and she knew immediately that UVM intended to do so, texting her parents that day the logo had been approved and was "going to the university for final approval."  SUMF, ¶¶ 45-48.  UVM unveiled the front-facing catamount logo over the next several months—formally presenting it to the Athletics Department (with

32

Plaintiff's assistance), displaying it on walls, putting it on uniforms (including helmets), and creating an apparel line. *Id.* ¶ 61. Notwithstanding her awareness that UVM was—as she had hoped—proceeding to use and invest in the front-facing catamount head logo, Plaintiff did not put UVM on notice of the alleged infringement until more than 300 days after she knew of its plans to use the logo. *Id.* ¶¶ 45-53, 58, 67-69. If UVM had known of Plaintiff's allegations of infringement at the outset, the University could have chosen to develop a logo through other means; UVM devoted significant time and resources to adopting and rolling out the logo in reliance on the understanding, implicitly ratified by Plaintiff's conduct, that it was at liberty to use the front-facing version of its logo.

In *Keane Dealer* Services, the court held that a copyright plaintiff was barred by estoppel from pursuing an infringement claim for use of copyrighted software because the author's "silence" when it knew defendant was using its software, "coupled with its willingness to assist" the defendant, constituted conduct the defendant was "entitled to rely"—and such reliance was detrimental, given that "had they known they were violating a copyright they could have easily negotiated a license agreement . . . or created a program of their own." 968 F. Supp. at 947-48. So too here: UVM was entitled to rely on Plaintiff's silence and participation in the roll-out of the front-facing catamount head logo, and its reliance resulted in a considerable investment in a logo that could otherwise have been avoided. Plaintiff is estopped from asserting copyright infringement on these facts. *See also Lab. Corp of Am. v. Schuman*, No. 3:06-CV-01566, 2009 WL 275859, at *6 (D. Conn. Feb.

4, 2009) (granting summary judgment to plaintiffs because they relied to their detriment on the copyright holder's failure to object).

## <u>Conclusion</u>

This is a decidedly unusual copyright case. A copyright claimant typically comes to the courts complaining of the misappropriation and use of an original creative work developed by the claimant; here, Plaintiff seeks to hold UVM liable for using a version of its own copyrighted logo. For all the reasons articulated above, she cannot do so. Defendant is entitled to summary judgment.

Dated at Burlington, Vermont this 10th day of July 2025.

By:    <u>/s/ Justin Barnard</u>
Justin Barnard, Esq.
Noah A. Greenstein, Esq.
Dinse P.C.
209 Battery Street, P.O. Box 988
Burlington, VT  05402
(802) 864-5751
jbarnard@dinse.com

*Counsel for Defendant*

34