```
                 UNITED STATES DISTRICT COURT
                          FOR THE
                    DISTRICT OF VERMONT


SOPHIA BOYAGES,                   )
                                  )
           Plaintiff,             )
                                  )
     v.                           )      Case No. 2:24-cv-538
                                  )
THE UNIVERSITY OF VERMONT AND     )
STATE AGRICULTURAL COLLEGE,       )
                                  )
           Defendant.             )
```

## OPINION AND ORDER

Plaintiff Sophia Boyages brings this action against the University of Vermont and State Agricultural College ("UVM") claiming copyright infringement.  Pending before the Court are the parties' cross motions for summary judgment.  For the reasons set forth below, UVM's motion for summary judgment (ECF No. 36) is granted and Boyages' motion for summary judgment (ECF No. 39) is denied.  The Court also denies UVM's motion for leave to file a sur-reply (ECF No. 55).

## Background

The following summarized facts are undisputed unless otherwise noted.

*UVM's Catamount*

UVM is a public institution located in Vermont.  UVM claims as its mascot the catamount (a large cat) and the current iteration of UVM's catamount logo was completed and published by UVM in 1996.[1]



UVM's original copyrighted image is called the "V-Cat," and it depicts the catamount leaping through the UVM "V" from right to left at a ¾ angle.  UVM's Athletics Department has used various versions of the V-Cat over the years, including sport-specific logos in which the catamount appeared holding relevant sports equipment.  In more recent years, the Athletics Department adopted the ¾ view of the catamount head from the V-Cat as a version of the logo in both a black-and-white version and in a catamount green, brown, gold, light brown, and orange version.

*UVM's Employment of Boyages*

UVM employed Boyages as an Administrative Assistant to UVM's Athletic Director (Jeffrey Schulman) from October 2022

---

[1] Boyages disputes that the logo was copyrighted in 1996, and instead states—without separate citation—that the effective date of registration for the logo copyright is May 5, 2022.  *See* ECF No. 41-1 at 3.

through December 2023.  When applying for the job, Boyages—who has a Bachelors of Art in studio art with a focus on graphic illustration and mural work—submitted a resume that highlighted her graphic design skills.  During her job interviews, she spoke about her passion for graphic design.

Boyages formally accepted her position with UVM on October 15, 2022, by signing an offer letter that specified that her position was "subject to the terms and conditions" of the UVM staff bargaining agreement.  ECF No. 36-11.  The applicable agreement, which was effective from May 20, 2022, through June 30, 2024, provided that all members had a "responsibility to comply with University policies."  ECF No. 36-12 at 20.

On October 24, 2022, Boyages attended a Human Resources on-boarding meeting.  When deposed, Boyages testified that she "would have known" about UVM's Intellectual Property Policy (hereinafter "IP Policy") after this HR meeting, as "they sent us a link to the website to go over anything that was sent on there."  *See* ECF No. 41-3 at 10.  She also testified that she did not follow the link to click through the various different policies, and that she did not discover that the policy may apply to her until she sought counsel.  *Id.* at 11.

The parties do not dispute that UVM had the IP Policy when Boyages was hired.  Section 2.3.2 of the IP Policy states that,

except for certain scholarly and artistic works defined

elsewhere in the policy:

> Intellectual Property developed by Covered Persons
> through the use of significant financial support from
> the University, including but not limited to use of
> University-supported facilities and resources as well
> as time devoted to University functions of research
> and other University activities are hereby assigned to
> the University and considered "University-Owned." The
> use of office space, personal computers and network
> access alone shall not be considered "significant"
> University support. Only when the use of University
> facilities, materials or other resources makes a
> material contribution to the Intellectual Property,
> will it be considered "significant" use.

ECF No. 36-13 at 5.  Moreover, the IP Policy stated that, except

where expressly set forth as exceptions within the policy,

"Intellectual Property developed by University faculty and staff

within the scope of the employment is owned by the University to

the extent permitted by law" and, where University ownership is

not automatically established by law, "such Intellectual

Property is nevertheless by operation of this Policy assigned to

the University as 'University-Owned.'" *Id.*  Section 2.4.1 of

the IP Policy states that Scholarly and Artistic Works shall be

and remain the property of their creators, "unless such

copyrighted works are (i) developed as part of a University

project, program or activity that is the subject of an external

University agreement; (ii) developed within the scope of

employment by non-faculty University Employees; or (iii)

developed as part of a University-Commission project or program under Section 2.3.4." *Id.*

The position description for an Administrative Assistant to the Athletic Director included responsibilities such as executive support for the Director of Athletics, coordination of travel, coverage of the main administrative office suit, and "support for other senior departmental administrators and department wide meetings." *See* ECF No. 39-3.[2]  Once hired,

---

[2] The full text of the job duties description is as follows:
Executive support for Director of Athletics
- Manage calendar; schedule and confirm meetings with internal and external constituents; handle meeting preparation and coordinate necessary follow-up
- Manage AD's incoming mail (regular and email) and assist with prioritizing and organizing responses.
- Create and generate reports as needed.
- Maintain confidential files.
- Coordinate and or create PowerPoint/Presi and other presentations.
- Preparation of briefing materials for meetings, travel, and on/off campus events.
- Coordinate with liaison to president, provost, and other coordinators as needed
Coordination of AD Travel, briefings and reports.
- Book accommodations and arrange other travel logistics as needed
- Provide travel itineraries
- Compose follow-up correspondence and related documents;
- Prepare expense reports and other forms and related materials;
- Create databases and generate specialized reports
General Office Coverage
- Provide coverage for main administrative office suite.
- Answer general athletic phone calls
- Greet office visitors

Boyages also performed other tasks in her position, including picking up and babysitting children, helping to recover missing receipts for athletic staff members, replicating invitations from Pinterest for the Athletic Department's internal use, creating graphics for UVM Athletic events, and creating a ticket certificate for gifting tickets to athletic events.

*Branding Working Group*

In January 2023, Krista Balogh, the Associate Athletic Director for External Relations & Communications, established the Branding Working Group ("BWG"). The parties agree that the goals of the BWG included cleaning up the Department's different marks and creating a more cohesive brand identity; but then dispute whether exploring potential additions to the existing Department logos was a goal. Members of the BWG included Boyages, Krista Balogh, and Pete Estes, Director of Broadcast and Creative Content for the Athletics Department. Other members of the BWG were all UVM employees.

---

Support for other senior departmental administrators and department wide meetings
- Schedule meeting dates, locations and guest speakers; coordinate catering as needed
- Create and coordinate agendas as needed
- Coordinate staff meetings and meeting locations
- Attend and take minutes at departmental staff meetings and meetings of Athletic Advisory Board

*See* ECF No. 39-3.

The BWG held its first meeting on January 24, 2023.  Though the parties dispute the exact terms of what was discussed at the meeting,[3] Boyages admits that she testified "that the group discussed wanting a new logo that was modern and in line with other Division 1 athletic programs" and that someone brought up that a front-facing version of the "rally cat" was something the group should look into.  *See* ECF No. 36-3 at 37-38.  Nor do the parties dispute that during the meeting, a team member shared the existing ¾ view of the catamount head in color, and then Estes circulated the same ¾ view but rendered in green, gold and white:

---

[3] The parties vigorously dispute both the goals of the BWG and what was discussed at the first meeting.  After UVM stated in its motion briefing that meeting members wanted to create a "full-on face shot of the cat head," Boyages called this assertion "unsupported."  ECF No. 49 at 4.  UVM then filed a motion for leave to file a sur-reply to correct the misstatement of fact, arguing that the notes to the meeting had explicitly stated that the BWG "agreed additional secondary marks would be good to look at including a full-on face shot of the cat head," *see* ECF No. 55, at which point Boyages filed an opposition to the request to file a sur-reply, explaining that whether "creating" a modern and front-facing version of UVM's catamount logo had been discussed by the BWG was a disputed material fact, and it should be for the jury to decide whether "see," "desire," and "interest," (wording used by those who attended the meeting) can be interpreted to mean "create," ECF No. 56.  The Court has read the briefing and denies the request for leave to file the sur-reply, because the Court has examined the underlying citations to the notes of the meeting and the deposition transcripts themselves and thus will disregard the characterizations of the evidence by both sides.



*See* ECF Nos. 36-21 and 36-22.

The parties agree that a few days after the meeting, Balogh circulated "Branding working group notes" via email. *See* ECF No. 39-14. In the notes, Balogh cautioned that "I would like our work to remain confidential until the time comes to share the VIG with the department. We don't need drafts of potential logos and artwork floating out to everyone just yet." *Id.* In goals for the group, she included: "Retire some marks and look at adding new to refresh understanding the VCAT will continue to be our primary and this could be an expensive endeavor so there will need to be some parameters in place for execution." *Id.* She wrote that the group "agreed additional secondary marks would be good to look at including a full-on face shot of the cat head;" "Discussed a green and gold only VCAT which Pete/Soph are looking in to;" and "Shared a green and gold cat head that Pete worked on." *Id.*

After the meeting on January 24, Estes created a green-and-gold version of the ¾ angle head (without white). *See* ECF No. 36-23.



That same evening, Boyages created an initial design of a front-facing catamount.  The parties dispute whether her main goal in creating this design was getting the image to look right / challenge herself as a graphic designer, or whether it was for UVM to use as a logo. At her deposition, Boyages stated that: "at the time I had just moved to a new place where I didn't know anybody, and I was looking for an opportunity to do a good job and have the people that I work with like me."  ECF No. 36-20 at 9-10. Boyages also testified at her deposition as follows:

> Q.  The reason that you started about creating that front-facing version of the catamount logo head was that it had been brought up in the Branding Working Group meeting you attended, correct?
>
> A. Yes.
>
> …
>
> Q. And you didn't have any plans to develop a catamount head logo prior to that meeting, correct?
>
> A. No.
>
> …
>
> Q. When you set about creating this front-facing version of the catamount logo head, was it your hope to develop something that UVM might ultimately use as its logo?
>
> A. If I felt it was strong enough to show.

Q. But your goal was to develop an image that you could then bring back to the Branding Working Group and present as an option, correct?

　　Ms. Betts: Objection.

Q. If you felt that it was strong enough.

A. Yes.

ECF No. 36-3 at 42-43.

This initial design (the "Design")[4] was created on Boyages' own computer, using her personal Adobe Photoshop account. She used reference photos to create the design, including UVM's V-Cat, a ¾ head only catamount head, and other images she located online, *see* ECF No. 39-21, including images of large cats and other front-facing animal designs (including a variety of cartoon/logo-style bears, dogs, and cats). She used the Pen tool in Photoshop and drew and layered multiple shapes until they "were stacked and proportioned in a way that resembled" her desired image. ECF No. 39-8 at 3-4.

The next day, Boyages showed Estes the Design to receive his thoughts and feedback. She texted him, "it is a big possibility I will not show Krista or the others if I can't get it to look right so keep it on the DL[.]" ECF No. 39-22. The

---

[4] This opinion will refer to the design begun by Boyages on January 24th as "the Design" in order to avoid confusion, though the Court also takes note of the fact that the Design underwent modifications between the evening of January 24th and the version that Boyages submitted with her copyright application.



day after that—January 26, 2025, at 3:36pm—she texted him the side by sides of both of their green and gold designs. *Id.* He told her it was "pretty epic," and then, when she asked for constructive feedback, texted: "Whiskers different colors?" *Id.* Boyages said she kind of liked it (as it was) but then sent a version with the whiskers the same colors back. *Id.*

At the BWG's second meeting on January 31, 2023, Boyages shared her working design with the hope that the Athletic Department would adopt it as an official logo. At that time, she did not make any demand or request for compensation for the design. The BWG loved the version. Immediately after the meeting, Boyages texted her parents that the logo had been approved and was "going to the university for final approval." ECF No. 36-27.

In February of 2023, Estes edited the design by (1) turning it into a vector image so that he could divide it in half and "mirror it" and (2) cleaning up the design so that the lines

11

were smoother.  ECF No. 36-5 at 20-26.  Below, the image shown
to BWG is on the left and the final image with Estes' changes is
on the right.

  

On April 19, 2023, the Athletic Department announced its
"new secondary logo the 'Rally Cat Head'" on social media.
After the announcement, Balogh texted Boyages and said, in part,
"Sorry we couldn't do the press release like you had asked and
hoped for the notation on" and "As I've said many times I am
grateful for you and for the people who contributed to this."
ECF No. 39-25.  UVM began to display the Design on walls, put it
on uniforms and an apparel line, used it in photos on social
media, and, in June of 2023, applied for trademark protection.

At some point, Boyages requested both credit and
compensation for the design.  According to Boyages, she made her
requests before the public announcement by UVM, and she
addressed them directly to Balogh and Schulman (both refused).
UVM disputes this timing, arguing that Boyages cannot name a
specific date.  UVM cites to Balogh's declaration, in which she

states that to her knowledge Boyages did not raise any demand for payment until the fall of 2023.  ECF No. 36-41 at 4.

In December of 2023, Boyages resigned from the Athletics Department.  That same month, she filed a copyright application for what she described as the "SophCat," identifying herself as the sole author and claiming that it was first published on January 31, 2023, and received a Certificate of Registration. *See* ECF No. 39-7.  The image submitted with the application was the revised version prepared by Estes; however, neither UVM nor Estes received mention in the copyright application.

Boyages sued UVM for copyright infringement in this Court and now, having completed discovery, both sides have moved for summary judgment.

## Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Id.* at 255; *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 145 (2d Cir. 2007) (In determining whether a genuine issue of facts exists, a court is required to "resolv[e] all record ambiguities and draw[] all factual inferences in favor of the non-moving party.").

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (alteration in original) (citation and internal quotation marks omitted). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Id.* at 166-67 (alterations in original) (citations and internal quotation marks omitted).

14

In cases involving cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## Discussion

To establish her claim of copyright infringement against UVM, Boyages must prove: "(1) ownership of a valid copyright; and (2) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003). UVM argues that Boyages cannot show that she has ownership of a valid copyright.

Under 17 U.S.C. § 410(c), a certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright. *Jorgensen*, 351 F.3d at 51. A registration certificate shifts the burden of proof to the party challenging the validity of the copyright. *See Fleurimond v. New York University*, 876 F. Supp. 2d 190, 198 (E.D.N.Y. 2012). However, this does not create an "irrebuttable presumption of copyright validity" and instead, "[w]here other evidence in the record casts doubt on the question, validity will not be assumed." *Durham Indus., Inc. v.*

15

*Tomy Corp.*, 630 F.2d 905, 908 (2d Cir. 1980).[5]   Here, UVM

claims that the copyright is not valid for two reasons: first,

because the design was created under the work for hire

exception; and second, because the design is derivative of UVM's

logo.[6]  Boyages asks for summary judgment to be entered in her

favor if UVM cannot rebut her presumption of copyright validity.

I.   *Boyages' Motion for Summary Judgment*

In moving for summary judgment, Boyages proceeds in two

parts.  First, she argues that she has made her prima facie case

and that she owns the Design.  Second, she addresses UVM's

affirmative defenses (including that the Design was created as a

work for hire and that it is a derivative of UVM's copyright).

The Court addresses UVM's affirmative defenses in more detail

below.

As an initial matter, the Court denies Boyages' motion for

summary judgment.  Boyages argues that her certificate of

---

[5] The parties argue over what information Boyages should have
included on her application for copyright registration.
However, the parties do not request that this Court solicit the
Register of Copyrights to advise the Court about the inaccurate
information, *see* 17 U.S.C. § 411(b)(2).  Instead, UVM alleges
that the information was inaccurate in an alternative argument.
Because the Court grants summary judgment to UVM on alternative
grounds, it does not reach this argument and, consequently, at
this time the Court is not soliciting the advice of the
Copyright Office (despite the mandatory nature of
17 U.S.C. § 411(b)(2)).
[6] Because the Court finds for UVM on both of these issues, it
does not address the "implied license" nor the "equitable
estoppel" issues.

registration is prima facie evidence that she is the owner of the Design, and that UVM cannot rebut the presumption of validity that the certificate gives her. ECF No. 39 at 14-17; ECF No. 49 at 3.  The certificate of registration states that Sophia Boyages is the author of the "SophCat," which was first published on January 31, 2023, and under the "Work made for hire" category, the certificate answers "no."  ECF No. 39-7. However, UVM has poked holes in Boyages' prima facie case. Drawing all reasonable inferences for UVM, UVM has identified evidence that Boyages was an employee of UVM, that she created the design at work after learning that the BWG wished to see a front-facing design in green and gold and with the purpose of having UVM use the logo, that her work assisting the BWG and creating graphics was within her job duties and so was the creation of the Design, that Estes assisted with the Design creation both through feedback and through actual edits made to the Design and that the Design itself relied heavily upon the V-Cat's ¾ head.  The Court examines the work for hire exception in more detail below, but it holds initially that UVM has rebutted Boyages' presumption of validity and the Court therefore denies Boyages' motion for summary judgment.

*II.    Whether UVM Holds Copyright Under the Work for Hire
        Exception*

Under the Copyright Act of 1976, a copyright generally "vests
initially in the author or authors of the work." 17 U.S.C. §
201(a).  The first exception to this rule is for works made for
hire: "In the case of a work made for hire, the employer or
other person for whom the work was prepared is considered the
author for purposes of this title, and, unless the parties have
expressly agreed otherwise in a written instrument signed by
them, owns all of the rights comprised in the copyright." 17
U.S.C. § 201(b).  "Generally, the party relying on the work-for-
hire exception"—here, UVM—"bears the burden of demonstrating
that it applies." *Horror Inc v. Miller*, 15 F.4th 232, 242 (2d
Cir. 2021).

Here, the work for hire exception is central to the case.
Though the parties both cite extensively to the IP Policy, that
policy itself states that certain scholarly and artistic works
remain the property of their creators unless certain exceptions
apply, including whether they were "developed within the scope
of employment by non-faculty University Employees."  ECF No. 36-
13.  If UVM can show that the Design is subject to the work for
hire exception, no further analysis of the Policy is necessary.

The parties do not dispute that Boyages was an employee of UVM
when she created the Design.  Their main disagreement concerns

whether Boyages created the design within the scope of her
employment, and to decide this question the Court looks at three
elements: whether the work "(1) was the kind of work that the
plaintiff was employed to perform; (2) occurred substantially
within the authorized time and space limits of the job; and (3)
was actuated, at least in part by a purpose to serve the
employer." *Fleurimond v. New York University*, 876 F. Supp. 2d
190, 200 (E.D.N.Y. 2012). To win summary judgment, UVM must
show that all three elements are met. *Id*. at 200. The Court
finds that UVM has established all three elements, even when
viewing the facts in a light most favorable to Boyages and
drawing all reasonable inferences in her favor.

*1. Kind of Work*

The Court first addresses whether Boyages' design creation
was "the kind of work that the plaintiff was employed to
perform." *Fleurimond*, 876 F. Supp. 2d at 200. In deciding this
factor, courts often look to the employee's job description and,
if the responsibilities are not in writing, to the degree of
control an employer had over the employee's project. *Id*. at
202; *see also Moonstruck Design, LLC v. Metz*, No. 02-civ-4025,
2002 WL 1822927, at *5 (S.D.N.Y. Aug. 7, 2002) (courts rely
"heavily on an employee's job description in order to determine
whether an employee's actions are within the scope of
employment" and "also look to the degree of control that an

19

employer had over the employee's project when determining whether an employee's project was the kind of work he was hired to perform").

The parties agree that Boyages was not hired by UVM to work as a graphic artist.  In addition, the parties agree that designing a secondary logo, or even graphic design itself, was not listed in the job description.  The job description did include "support for other senior departmental administrators and department wide meetings," and Boyages, who had emphasized her passion for graphic design during the job interview process, did create graphics for UVM Athletic events at her job.

Boyages disputes the degree to which she created original graphics for UVM, stating that while she was tasked with copying and pasting clip art to create holiday cards and the like, she was not hired for the purpose of creating original graphic material for UVM's Athletic Department.  Drawing all inferences for Boyages, the Design she worked on is more complicated than other flyers and invitations she created in her position.  However, even though in creating the Design Boyages was undertaking a degree of more complicated work, it does not follow that she was not doing the kind of work she was employed to do.

In *Sterpetti*, although originally hired to be a preparation cook, Sterpetti was then asked to head up the pasta program and

to create a manual.  The court found that: "[a]lthough Sterpetti was not hired specifically to work on the pasta program or to create the Manuals, clearly his job requirements changed during the course of his employment… such that his job included, if not focused almost entirely on, those tasks." *Sterpetti v. E-Brands Acquisition, LLC*, No. 6:04-cv-1843, 2006 WL 1046949, at *5 (M.D. FL. Apr. 20, 2006).  The Court finds that this case is similar to *Sterpetti*.  Although Boyages was not hired specifically to be on the BWG committee, she was put on the committee to provide support to the Athletics Department and the work she undertook in creating the Design was of the kind she was hired to do. This is true even assuming that it was more complicated than previous graphics she was asked to create.

According to Boyages, creating a secondary logo cannot have been the kind of work she was hired to do because the BWG's goals are disputed.  Yet even drawing all inferences for Boyages—assuming that BWG's goals were to develop brand consistency and work on colors, not to develop a new secondary logo, Boyages does not dispute that at the first BWG meeting a front-facing "rally cat" was mentioned as something the group should look into.  Nor does she dispute that it was after that meeting that she first had the idea to try her design.  The fact that no one specifically told Boyages to come up with the Design

herself does not take her work outside of the "ultimate objective" of UVM.

In *Fleurimond*, the plaintiff created a graphic design called "Orion" and sued NYU for copyright infringement. *See Fleurimond*, 867 F. Supp. 2d at 191. Fleurimond was employed as an equipment room aide. She then accepted a graphic design position that doubled her pay, though no new position description was provided and no new paperwork was filled out by NYU. *Id.* at 192. Because no written description was available, the court examined "the degree of control that an employer had over the employee's project." *Fleurimond*, 876 F. Supp. 2d at 202 (quoting *Moonstruck Design*, 2002 WL 1822927, at *5). The court found that NYU had exercised control over the design, where Fleurimond was asked by an NYU employee to create it, and NYU gave instructions to Fleurimond with respect to modifications to the design (and on other mascot designs done by the plaintiff). *Id.* at 202-204.

Fleurimond argued that her work creating the "Orion" design differed from her other graphic design work because of its nature—in that case, because creating Orion required additional artistic ability. *Id.* at 204. Yet the court found that even if artistic ability was not a prerequisite of her employment, it did not follow that it was not the kind of work she was employed to perform "if the use of her artistic skill on the mascot

22

design project was incidental to her employment as a graphic
designer." *Id.*  The court further said that the mascot design
project was at least incidental to the plaintiff's job
responsibilities of creating promotional materials for the NYU
Athletic Department, where the project was "within the ultimate
objective of the principle."  *Id.*

Boyages argues that in *Fleurimond*, the plaintiff accepted a
new graphic design position and her compensation was doubled in
recognition of the different nature and scope of her employment—
whereas Boyages' compensation was not changed.  However, unlike
the plaintiff in *Fleurimond*, Boyages was employed as an
administrative assistant who was already doing some level of
graphic design work (though the Court accepts the inference that
her other graphic design work was more of a simple, copying and
pasting nature).  Increased compensation is not a necessary fact
under the "kind of work" element.

As for control, Boyages argues that in *Fleurimond*, NYU gave
instructions to the plaintiff to modify the design to its
liking, whereas "no such control exists in the present case"
especially where Boyages was not asked to create the new
secondary logo.  Yet Boyages does not dispute that the BWG
committee was interested in seeing a front-facing design; nor
does she dispute that her design was twice edited by Estes:
first, when he gave her constructive feedback and she

23

implemented the feedback (color of the whiskers);[7] and second,
when he took it upon himself to mirror the image and smooth out
the designs.  In fact, when Estes first suggested over text that
Boyages change the color of the whiskers, she made the change
even while insisting that she kind of liked it as it was (with
the different shading on each side).  These are instances of
control being exercised—which, in this context, is more than
what UVM would need to show.  *See, e.g., Martha Graham School
and Dance Foundation, Inc. v. Martha Graham  Ctr. of Contemp.*

---

[7] In her briefing, Boyages admits that she changed the colors of
the whiskers after the text exchange with Estes, but she
maintains that she "did not edit the design based on Mr. Estes'
feedback.  There is no evidence to support this as an undisputed
fact. […] Plaintiff and Mr. Estes had creative conversations
regarding the design."  ECF No. 41-1 at 17.  The dispute appears
to be based on Boyages' characterization of Estes' edits as
trivial and/or "creative conversations."  As Boyages explained
in her deposition:

> Q. And you didn't inform the US Copyright Office that this
> was based, in part, on other prior works, did you?
> A. No.
> Q. You don't deny that Pete contributed to the final image,
> do you?
> A. Pete and I had creative conversations regarding the
> logo.  Pete did not make edits that were not trivial to the
> finished logo.  If you compare the two side-by-side, the
> changes are not significant enough to not be mine still.
> Q. Okay.  So, even though this image is not the actual
> image that you designed and turned over to UVM, you did not
> disclose to the Copyright Office that it had another author
> who contributed to it?
> A. Again, I don't view Pete as an author.

ECF No. 36-3 at 63.  The Court will refer to the text exchange,
which is undisputed, as feedback—a word used in the exchange
itself—though it takes note that Boyages considers this to be a
trivial, creative conversation.

24

*Dance, Inc.*, 380 F.3d 624, 642 (2d Cir. 2004) ("It is true that the Center did not exercise much control over Graham, but the absence of a hiring party's exercise of control does not mean that an artist is not an employee where other factors weigh in favor of finding an employment relationship." (emphasis in original)).

Moreover, the unique factors in this case create an interesting tension between the exercise of control and the derivative work exception analyzed in the next section. Because the Design is so similar to the V-Cat itself, there was not much control left for UVM to exercise since Boyages used UVM's mascot as a reference image for her work. Part of her motivation was to create a similar enough logo that UVM would wish to use it. This is why UVM only needed to suggest small changes. For example, it would not have made sense for UVM to ask Boyages to change the colors of the design to be navy and white, because UVM's colors are not navy and white. It would not have made sense for UVM to ask Boyages to draw eyebrows that did not connect directly to the eyes of the catamount, because the ¾ version of the head already has eyebrows that connect directly to the eyes.

The Court therefore finds that there is no genuine issue of material fact remaining as to whether creating the Design was the kind of work Boyages was hired to perform: it was.

*2. Time and Space Limits of the Job*

Second, the Court finds that Boyages did the bulk of her work outside of work hours but that a substantial amount was also done during work hours. Drawing all inferences for Boyages, the bulk of her work creating the Design was done outside of work hours, on her own personal computer using her own personal version of Adobe. Boyages emphasizes that she did much of her work the night of January 24, 2023, and that she already had a working graphic once the evening was over. However, this second element cannot be decided merely by looking at what time Boyages began work upon the Design. *See, e.g., Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) ("When [the first] element of the Restatement test is met, courts have tended not to grant employees authorship rights solely on the basis that the work was done at home on off-hours.").

Here, Boyages does not dispute that she showed Estes the Design in person on January 25, 2023, nor that she adjusted the Design (in response to his feedback) on January 26, 2023—both during work hours. And again, even though no one at her work asked Boyages to create the Design, she got the idea after the first BWG meeting and worked on it that very night. Finally, in making the Design, Boyages used the V-Cat as one of her references. Accordingly, the Court finds that—even when viewing

26

the facts in a favorable light and drawing all inferences in her
favor—a substantial part of her work was done within the time
and space limits of the job.

   *3. Motivation*

   Finally, Boyages was at least "appreciably" motivated by a
desire to further the goals of UVM's Athletic Department. *City
of Newark v. Beasley*, 883 F. Supp. 3, 9 (D.N.J. 1995) (citing
*Avtec Systems, Inc. v. Peiffer*, 21 F.3d 568 (4th Cir. 1994)).
Boyages argues that because no one at UVM asked her to create
the Design, and because she asked Estes to keep it on the "DL",
she was motivated by challenging herself and her artistic
abilities, not benefiting UVM.  The Court finds that, construing
the evidence in favor of Boyages, it is reasonable to assume
that she was largely motivated by a wish to challenge herself.
However, the Court cannot infer that she was solely motivated by
a desire to challenge herself until after she had finished the
Design—and then suddenly it occurred to her to show the Design
to the BWG group.  Such an inference would be an overstatement
of her testimony.  At her deposition, Boyages agreed that "the
reason" she "started about creating that front-facing version of
the catamount logo head was that it had been brought up in the
Branding Working Group meeting" she attended.  ECF No. 36-3 at
42.  She further testified that it was her hope to develop
something that UVM might ultimately use as its logo "if I felt

27

it was strong enough to show," ECF No. 36-3 at 43, and that she
wanted to do a good job and have her coworkers like her, ECF No.
36-20 at 10.  Boyages asks the Court to read this testimony as
only stating that she wished to challenge herself as an artist.
Rather, the testimony states that she was hoping to create
something good enough to show to the BWG group—which she then
did.  *See* ECF No. 36-20 at 12 ("Q. [Y]ou presented the logo to
the group in the hope that UVM would adopt and use it, correct?
A. Yes."); *see also Fleurimond*, 876 F. Supp. 2d at 209
(explaining that plaintiff's concession that she "delivered the
design to NYU with the hope and intention that NYU would use it"
"weighs heavily in favor of finding that . . . [p]laintiff's
motivation was to serve NYU").

But for the group's interest in seeing a front-facing
catamount, Boyages would not have begun the Design*.  See McKenna
v. Lee*, 318 F. Supp. 2d 296, 301 (E.D.N.C. 2002) (finding
license plate design was a work for hire and "created primarily
for the benefit of the employer" where, notwithstanding fact
that it was developed in plaintiff's own time and space, it was
"clear that but for the employer's specific need for a new
license tag design, the . . . design would not have been
created" by plaintiff), *aff'd*, 53 F. App'x 268 (4th Cir. 2002).
No reasonable juror could find that she was not motivated, in
large part, to serve the interests of UVM.  *Fleurimond*, 876 F.

Supp. 2d at 209 ("Even assuming that the [p]laintiff created Orion in part based on her personal desire to receive royalties, no reasonable juror could find that she was not motivated in large part to serve the interests of NYU.").

Apart from her own testimony, which supports the inference that—at most—Boyages had multiple motivations, there is no additional evidence for a jury to weigh here to create a dispute of material fact. For example, there is no evidence that Boyages was ever told that UVM would not want a graphic similar to what she was trying to create. *See Roeslin v. District of Columbia*, 921 F. Supp. 793, 798-799 (D.D.C. 1995) (Where plaintiff approached his supervisor about writing a computer program but his supervisor discouraged him from doing so, stating that it would detract from his other job duties and because the office had already decided to pursue a different route, court found that it "is disingenuous for the District to initially have stated that the plaintiff could not create the system, and now assert that plaintiff did so for the District's benefit" as his motivation). Nor is there evidence that Boyages created her graphic with any other university's mascot in mind. *See Pavlica v. Behr*, 397 F. Supp. 2d 519, 525 (S.D.N.Y. 2005) (genuine issues of material fact existed as to whether a manual created by a high school teacher was a work for hire, where jury could accept Pavlica's assertions that "he created the manual

29

and course without any prompting or direction by Byram Hills,
using his own resources" and "he designed the course and manual
to be implemented at any high school in the country.").

For these reasons, the Court finds that UVM has carried its
burden of showing that the "work-for-hire" exception applies in
this case.  The Court grants UVM summary judgment on this issue;
in the alternative, however, the Court also examines whether UVM
holds copyright under the derivative work exception.

### III. Whether UVM Holds Copyright Under the Derivative Work Exception

Under the Copyright Act, a copyright holder has the
"exclusive right" to prepare "derivative works based upon the
copyrighted work."  17 U.S.C. § 106(2).  A "derivative" work is
one "based upon one or more preexisting works" that "recast[s],
transform[s], or adapt[s]" the original work.  *Id.* § 101; *see
also Underwood v. Lastrada Ent. Co., Ltd.*, No. 16-cv-09058
(DLC), 2020 WL 3640532, at *7 (S.D.N.Y. July 6, 2020) ("A
derivative work is one that is 'substantially copied from a
prior work.'" (quoting 1 Nimmer on Copyright § 3.01)).
"Unauthorized derivative works are typically afforded no
copyright protection because they unlawfully infringe the
exclusive rights of the original author."  *Keeling v. Hars*, 809
F.3d 43, 48 (2d Cir. 2015).  If, however, "the secondary work
sufficiently transforms the expression of the original work such

30

that the two works cease to be substantially similar, then the secondary work is not a derivative work and, for that matter, does not infringe the copyright of the original work." *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 143 n.9 (2d Cir. 1998) (citing 1 Nimmer § 3.01 at 303 as "stating that 'a work will be considered a derivative work only if it would be considered an infringing work' if it were unauthorized").

If Boyages did not create her design under the work for hire exception, such that the copyright belonged to UVM, then UVM argues that Boyages had no license to use UVM's copyrighted logo to create a derivative work. Boyages does not dispute this assertion, as she brings to this Court's attention no evidence to show that she had a license from UVM to create a derivative work in her own name.[8] The Court must therefore decide whether

---

[8] In her initial motion for summary judgment, Boyages argues that her design is not a derivative of UVM's V-Cat but, in making her argument, she cites to the factors for the test of whether a derivative work is independently worthy of copyright protection. *See* ECF No. 39 at 28-35 (citing *U.S. Auto Parts Network*, *Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012)). However, as *U.S. Auto Parts* explains, § 103 of the Copyright Act "provides that a derivative author may own the copyright in material the author contributed to a preexisting work, but not in infringing material or material the author did not create." *Id.* at 1016. The question here is not whether Boyages has contributed enough of her own material to a preexisting work to make her work a copyrightable derivative work. She cannot copyright the Design if it is derivative of UVM's V-Cat, because UVM holds the "exclusive right" to prepare derivative works.

the Design is derivative of UVM's copyrighted logo, or whether
it is original enough to be its own design such that it does not
infringe on UVM's copyright. *See* 1 NIMMER ON COPYRIGHT § 3.06
(2025)("If the pre-existing work that serves as the basis for a
derivative or collective is itself protected by copyright, then
its unauthorized incorporation into a derivative or collective
work constitutes copyright infringement.").

The determination of "substantial similarity" typically
relies on the ordinary observer test, which asks whether "the
ordinary observer, unless he set out to detect the disparities,
would be disposed to overlook them, and regard [the] aesthetic
appeal [of the two works] as the same." *Peter F. Gaito*
*Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir.
2010). The test is guided by "good eyes and common sense," and
involves a "visual comparison of exhibits." *Id.* The Second
Circuit has "disavowed any notion that we are required to
dissect the works into their separate components, and compare
only those elements which are in themselves copyrightable." *Id.*

---

Instead, the central question in this case is whether Boyages'
work is different enough that it is *not* a derivative work. *See*
*Abdin v. CBS Broadcasting Inc.*, 971 F.3d 57, 69n.8 (2d Cir.
2020) ("the fact that the Videogame might contain sufficient
original expression for copyright protection, is irrelevant to
the issue of whether *Discovery* is substantially similar to the
protectible elements of the Videogame to establish
infringement.").

In order to compare the designs, the Court must first decide which designs to compare.  UVM compares Estes' green-and-gold ¾ head with the Design.  *See* ECF No. 45 at 16.  However, UVM does not have a copyright registration for Estes' green-and-gold ¾ cat head design, and the colors of that head distinguish it from the head contained within the V-Cat.  In conducting its analysis of similarity, the Court will consider the design of the five-color catamount head, with the following caveat.  It is undisputed that Estes' gold and white rendering (ECF No. 36-22) was distributed to the BWG during its first meeting, and it is undisputed that Boyages had a copy of Estes' green and gold ¾ head by January 26, 2025.  There is also evidence that the BWG discussed green and gold colors at its first meeting.  Moreover, the V in the V-Cat is done in green and gold.  Thus, even drawing all inferences for Boyages and assuming that she had completed her design before seeing the Estes final rendering, it is not reasonable to infer that she went to a color wheel and decided anew which colors to use for her version of the design.  Therefore, though the Court will not use the "overwhelming similarities in color choices" as support "toward a finding of infringement," *see Boisson v. Banian, Ltd.*, 273 F.3d 262, 274 (2d Cir. 2001), it will also not allow those color choices to be a factor in favor of the Design's differences.



A visual comparison of the two designs reveals that they share many elements, including general shape and the arrangement and size of features. Boyages' expert, Joe Bosack, concludes that though "there may be some subtle similarities between the two marks, there are far more differences that make them dissimilar." ECF No. 39-26 at 4. UVM's expert concludes that the key, defining elements are all the same. ECF No. 36-39 at 17. Because "the well-established general rule in this circuit has been to limit the use of expert opinion in determining whether works at issue are substantially similar," *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992), this Court will not base its analysis upon these differing opinions.

Boyages argues that an animal's natural appearance is not copyrightable, and that many similarities between the two designs come from the natural shapes of a large cat. ECF No. 39 at 29. Courts have found that "anatomical features on replicas of animals are ideas not entitled to copyright protection," while at the same time clarifying that "the manner in which" a

design "expresses these features may be protectable, as long as
that expression is original and not dictated by the underlying
idea." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*,
783 F.3d 527, 551 (5th Cir. 2015); *see also L.A. T-Shirt &
Print, Inc. v. Rue 21, Inc.*, No. 16-cv-5400, 2017 WL 3575699, at
*5 (S.D.N.Y. Aug. 17, 2017) ("But the line between anatomy and
expression is not always a fine one: the difference between a
goldfinch on a museum wall and that in an ornithology text may
be easier to see than to describe.").  The thick-lined,
cartoonish characterization of a catamount here offers more
originality than if UVM were merely trying to project a
realistic photo of a catamount's "gaze and expression" and
"pose." *See Carrell v. Origami Owl, LLC*, 18 Civ. 694, 2019 WL
1330941, at *3 (S.D.N.Y. Mar. 25, 2019) (finding only a low
level of originality in the "gaze and expression," "pose," and
"grooming" depicted in a photo of a dog named Tinkerbell, and
holding that as a matter of law substantial similarity did not
exist).  Here, the Court finds that it is not only the features—
such as ears, eyes, and whiskers—that are the same between the
two designs, but the expression of those features as well.

     There are certainly differences between the designs.  As
Boyages points out, one is a head-on view, and the other is
taken from ¾.  Other obvious differences include (but are not
limited to): the angle and proportion of the ears, whether a

tongue is visible, the shape of the chin, the number of whiskers, and jagged fur vs. a smooth jawline. Yet despite these differences, the Court holds that a jury could not find that an ordinary observer would be disposed to regard the "aesthetic appeal" of the two images as anything but the same.

The similarities, such as the shape of the eyes and the upper muzzle, are striking, are taken from UVM's original V-Cat design, and reveal that the two designs share the same aesthetic appeal. The Design has the same appearance as the original ¾ head, but this time face-on, and the slight alterations in appearance in the Design do not change the substantial similarity inherent in their concept and feel. The Court therefore finds that the Design is a derivative of UVM's copyrighted V-Cat.[9]

### Conclusion

UVM owns copyright to the Design under the work for hire exception and, in the alternative, Boyages cannot own the

---

[9] The Court also finds that the copyrighted portions of the Design that come from the V-Cat tend to pervade the entire derivative work. *See* NIMMER, §3.06 (Under Section 103(a) of the Copyright Act, "only the portion of a derivative or collective work that employs the pre-existing work would be denied copyright" and the "effect generally would be to deny copyright to derivative works in which the pre-existing work tends to pervade the entire derivative work, but not to collective works in which the infringement arises from the copying of the selection and arrangement of a number of pre-existing works[.]").

copyright to an unauthorized derivative work.  For the reasons set forth above, UVM's motion for summary judgment is granted. Boyages' motion for summary judgment is denied.  The Court also denies UVM's motion for leave to file a sur-reply.

Dated at Burlington, Vermont this 4th day of November 2025.


/s/ William K. Sessions III
Hon. William K. Sessions III
United States District Judge